## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Jorge Duran, being duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I am a criminal investigator with Homeland Security Investigations (HSI) and have been since December of 2018. I am a sworn investigative or law enforcement officer and am empowered by law to conduct investigations and to make arrests.

2. I have completed multiple federal law enforcement academies, including the Criminal Investigator Training Program (CITP) and the HSI Special Agent Training Program (HSISAT) at the Federal Law Enforcement Training Center in Glynco, Georgia. During CITP and HSISAT, I received training regarding investigative techniques relating to violations of federal laws, including the application and execution of search and arrest warrants. As such, I am an investigative law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3. Prior to becoming a Special Agent, I was a Border Patrol Agent from March of 2005 until December of 2018, where I was stationed at the Ajo Border Patrol Station and Casa Grande Border Patrol Station, both of which are in Tucson Sector in Arizona and Brackettville Border Patrol Station, in Del Rio Sector, Texas. These assignments included the interdiction and investigation of undocumented alien loads and smugglers, drug and narcotic loads and smugglers, and weapons smuggling loads. I was also assigned to the Sector Intelligence Units where I conducted all source intelligence gathering and later became a Task Force Officer with Homeland Security Investigations in Sells, AZ in which I partook in investigative duties such as conducting surveillance, report writing, handling confidential informants, and making arrests.

4. Prior to joining the United States Border Patrol, I served for four years as a Security Forces member in the 355th Security Forces Squadron based in Davis-Monthan Air Force Base in Tucson, AZ. As a Security Forces member, I was tasked with conducting law

enforcement duties on the air force base which also included protection of Air Force resources, to include personnel, nuclear or conventional weapons, and aircraft.

5. By virtue of my employment as a Special Agent, I have performed various tasks, which include, but are not limited to: (a) functioning as a surveillance agent, thus observing and recording movements of persons smuggling drugs, and those suspected of smuggling drugs; (b) interviewing witnesses and suspects relative to the illegal smuggling of drugs; (c) functioning as a case agent, entailing the supervision of specific investigative functions involving the smuggling of drugs; and (d) exploiting digital forensic data to further investigative leads.

6. In the course of conducting investigations, I have personally interviewed persons involved with drug smuggling. I have consulted with other experienced investigators concerning the practices of drug smugglers and the best methods of investigating them. In preparing this Affidavit, I have conferred with other Special Agents and law enforcement officers involved in this investigation. Furthermore, I have personal knowledge of the following facts or have learned them from the individuals mentioned herein.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that Teddy Joseph VON NUKEM has committed violations of 21 U.S.C. § 841 and 846. I further submit that there is probable cause to search the information described in Attachments A for evidence, fruits, contraband, and instrumentalities of the foregoing crimes, as further described in Attachments B.

## IDENTIFICATION OF THE ITEM TO BE SEARCHED

9. I am submitting this affidavit in support of an application for the issuance of a search warrant authorizing HSI Special Agents, and other law enforcement officers, to conduct a search of the properties described below:

   a) Cellular phone utilizing phone number 386-341-3800 (IMEI 355539116200740) operated by Teddy VON NUKEM. This cellular phone is referred to as the TARGET DEVICE #1, or TD#1, and is further described in Attachment A of this Application (which is attached and incorporated herein for reference).

10. Further, I submit there is probable cause to believe that the TARGET DEVICE #1 also contains evidence, fruits and instrumentalities of these crimes as well as the identities of persons involved, as more fully described in this search warrant and the attachments. The applied for warrant is to authorize the forensic examination of the TARGET DEVICE #1 described in Attachment A for the purpose of identifying electronically stored data particularly described in Attachment B.

11. Agents have reason to believe, as described in the Probable Cause section, that Teddy VON NUKEM utilized TARGET DEVICE #1 to conduct a smuggling attempt on March 17, 2021 through the Lukeville Port of Entry. The requested warrant would authorize the forensic examination of the TARGET DEVICE #1 for the purpose of identifying electronically stored data to include: any telephone numbers, including but not limited to numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored voice and text messages, calling card numbers, text messages, photos, videos and/or identifying information that may be stored in the memory of TARGET DEVICE #1 for the items described in Attachment A (incorporated herein by reference).

## BACKGROUND ON SMARTPHONES

12. Based upon my knowledge, training, and experience, as well as information related to me by law enforcement officers and others experienced in the forensic examination of electronic communication devices, I know that certain types of cellular telephones referred

to as "smartphones" (such as the TARGET DEVICE) generally offer more advanced computing ability and internet connectivity than standard cellular telephones. Provided that internet access has been purchased through an electronic communication service provider for a particular smartphone, a smartphone is capable of running complete operating system software, has full access to the internet and/or electronic mail (including file attachments), is capable of text and instant messaging, can create and edit documents created with computer software, is capable of storing large amounts of data, and can be interfaced with desktop and laptop computers.

13. As described in Attachment B hereto, this affidavit seeks permission to locate not only data files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes which individual(s) used the device as well as the purpose of their use. Additionally, this affidavit seeks information about the possible location of other evidence.

14. As described in Attachment B hereto, this affidavit also seeks permission to search and seize certain electronic records that might be stored within the device. Some of these electronic records might take the form of files, documents, or other data that are user generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

15. Although some of the records requested in this affidavit might be found in the form of user-generated documents (such as electronic format documents, picture, and movie files), electronic communication devices (such as the TARGET DEVICE) can contain other forms of electronic evidence that are not user-generated. In particular, an electronic communication device may contain records of how it has been used and/or the person(s) who utilized the electronic communication device. Based upon my knowledge, training, experience, as well as information related to me by law enforcement officers and other persons involved in the forensic examination of electronic communication devices, I know that:

    a. Data on electronic communication devices not currently associated with any file

can provide evidence of a file that was once on the electronic communication device, but has since been deleted or edited, or of a deleted portion of a file;

b.   Virtual memory paging systems can leave traces of information on an electronic communication device that can be used to determine what tasks and processes were recently in use;

c.   Web browsers, e-mail programs, social media platforms, and chat programs store configuration information on the electronic communication devices that can reveal information such as online nicknames and passwords;

d.   Operating systems can record additional information, such as the attachment of peripheral electronic devices, and the number of occasions in which the peripheral electronic devices were accessed;

e.   Computer file systems can record information about the dates that files were created and the sequence in which they were created. This information may be evidence of a crime and/or indicate the existence and/or location of evidence in other locations on the electronic communication device;

f.   When an electronic communication device has more than one user, files can contain information indicating the dates and times that the files were created as well as the sequence in which the files were created, and whether a particular user accessed other information close in time to the file creation dates, times, and sequences;

g.   The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence or a space where evidence was once located, contextual evidence identifying an electronic communication device user, and contextual evidence excluding an electronic communication device user. All of these types of evidence may indicate ownership, knowledge, and intent to commit a given offense; The foregoing type of evidence is not "data" that can be segregated, that is, this type of information cannot be abstractly

reviewed and filtered by a seizing or imaging agent and then transmitted to investigators. Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how electronic communication devices operate and how electronic communication devices are used. Therefore, contextual information necessary to understand the evidence to be seized, as described in Attachment B also falls within the scope of the warrant.

**CHARACTERISTICS OF INDIVIDUALS INVOLVED IN DRUG SMUGGLING**

12. Based on my training, education, experience and discussions with other law enforcement officers, I know that:

A. Drug smugglers keep records of smuggling transactions and associated activities such as customer lists, ledgers, employee lists, contacts lists, which include telephone numbers, in their residences and stash houses or other places with ready access, such as their vehicles, storage area, and offices, and conceal such items from law enforcement authorities; while drugs may be moved or transported from these locations, the above referenced items remain;

B. Drug smugglers often maintain currency in their residences, stash houses, vehicles and other areas in order to finance their ongoing illegal activities and other businesses, including using such currency to pay bills and drug transporters, and to acquire assets and make other purchases. Interviews of drug load drivers and other smuggling witnesses indicate that transactions are usually conducted in cash.

C. Drug smugglers often store smuggling transaction records, customer lists, wire transfer receipts, and other evidence of financial transactions relating to the obtaining, transferring, secreting and spending of various sums of money made from engaging in drug smuggling activities in their residences, stash houses, vehicles, offices, and storage areas;

D. Drug smugglers often amass large amounts of criminal financial proceeds, and have bank account records and receipts, vehicle ownership and insurance records, storage area rental agreements, records of mail service, and other records pertaining to the conduct of their

6

criminal activity, and such items are typically secured in their residences, stash houses, vehicles, office, and storage areas;

E. Drug smugglers and their associates who actively assist in the smuggling of drugs into the United States will have maps showing the smuggling routes, foreign fuel receipts, receipts pertaining to the purchase and registration of drug load vehicles, receipts showing modifications and repairs to vehicles; receipts showing the purchases of items commonly used by smugglers such as portable radios, firearms, and other items used to transport and conceal drugs. These individuals will also possess these purchase items in their residences, stash houses, vehicles, offices, and storage areas;

G. Drug smugglers often attempt to conceal property subject to seizure in stash houses, in attached or unattached buildings, and in vehicles at such premises, and that drug smugglers will frequently conceal drugs in their residences, stash houses, attached and unattached out buildings, shelters and vehicles on such premises;

H. Based on my training and experiences, drug smugglers often have firearms in their possession, on their person, in stash houses or in their residence. Firearms include, but are not limited to: handguns, pistols, revolvers, rifles, shotguns, and machine guns. Also, smugglers will utilize bulletproof vests, radios, cellular phones, and other equipment to avoid or escape detection by law enforcement officials. The aforementioned firearms and equipment is used to secure and protect a smuggler's property, which may include but is not limited to aliens, narcotics, currency, vehicles, jewelry, books, records, and ledgers of narcotics and trafficked persons' transactions.

I. Drug smugglers store large quantities of drugs in various locations commonly referred to as stash or drop houses. These structures can be single-family homes, detached garages, barns, trailers, townhouses, apartments, warehouses, or ranches. Drug smugglers utilize these locations to store bulk quantities of narcotics while coordinating movement of the drugs further along the route to their final destinations. Drug smugglers employ people to

safeguard such locations to ensure that the drugs are not stolen by rivals or seized by law enforcement. Often times the subjects responsible for safeguarding the stash house are armed and utilize various forms of electronic devices such as cellular phones, pagers, and handheld radios, to communicate with other members of the criminal organization.

  J. Drug smugglers utilize cellular telephones to communicate with each other when coordinating their illegal activity. Drug smugglers communicate on cellular telephones with the associates to arrange transportation and provide step-by-step travel instructions, including coordinating the timing of couriers meeting up with drivers at locations along the travel route and transferring information about who will be picking them up and in what type of vehicle. Drug smugglers also use cellular telephones to communicate with each other to coordinate the transportation and the timing of picking up and dropping off drugs along the route of travel including timing the pick-up of drugs after they have crossed the international boundary fence and are taken to a stash house and then further moved from the stash house to the next transportation location further north. Drug smugglers also use cellular telephones to scout for law enforcement, and to transfer information about the smuggling activity to each other through technology on the cellular phones including but not limited to photographs, videos, and text messaging.

  K. It is common for drug smugglers to conspire with others willing to participate and further assist in these activities. Cellular phones are one of the most immediate, convenient, and effective ways to communicate over long and short distances to coordinate the criminal activity.

  L. It is common for drug smugglers to use prepay or burner phones to coordinate their criminal activity because these phones are difficult to trace to individuals and may contain limited information about an individual.

  M. It is common for drug smugglers to leave prepay or burner phones that are no longer in use in stash houses. While no longer used by the organization, these phones can

contain valuable evidence about the drug smuggling organization's criminal activities. These phones also can contain valuable evidence about the criminal activities.

N. Cellular phones of drug smugglers found in stash houses may contain evidence identifying cell phone users, contacts made with co-conspirators (to include time, date, and duration of calls), photographs of conspiracy members and/or currency, and text messages (including time), all of which may lead to additional evidence about the drug smuggling organization's method of operation, members, and counter-surveillance techniques.

O. Also, current technology allows cellular phones to receive and transmit media in the form of pictures and movies. Smugglers often take pictures of themselves, their associates, and their property. Smart phones are also equipped with access to the internet and allow the user to transmit electronic mail (E-mail) as an alternative form of communication. Smugglers commonly maintain addresses or telephone numbers in cellular telephones that include names, addresses and/or telephone numbers of their associates in the smuggling organization.

P. The application seeks permission to locate not only phone numbers, text messages, and voice messages that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how the cellular phones were used, purpose of their use, who used them, and when they were used.

13. As such, it is known to your affiant that such items often contain evidence of such unlawful activities.

## STATEMENT OF PROBABLE CAUSE

14. On March 17, 2021, Teddy Joseph VON NUKEM applied for entry at the Lukeville Port of Entry in Lukeville, Arizona. VON NUKEM was the driver and sole occupant of a 2019 Nissan Pathfinder. During the primary inspection with Customs and Border Protection (CBP), VON NUKEM denied bringing in any plants, meats, vegetables, monetary instruments over $10,000 in U.S. currency, commercial merchandise, and/or contraband in the 2019 Nissan

Pathfinder. VON NUKEM and the vehicle were referred for a secondary inspection. During the secondary inspection, a CBP canine alerted to an odor it was trained to detect emanating from the rear passenger third row seat/cargo area of the 2019 Nissan Pathfinder. CBP officers searched the vehicle found 14 packages concealed under the third row seat and cargo floor compartments. The 14 packages contained pills which field tested positive for the properties consistent with fentanyl. The packages of fentanyl weighed approximately 15.08 kilograms.

15. VON NUKEM was in possession of a Motorola cellular phone (Model: XT2043-4, IMEI: 355539116200740), TD #1, when he applied for entry into the United States.

16. During a post-*Miranda* interview, VON NUKEM stated he had been in Mexico for approximately three months with his wife and children. VON NUKEM stated he was traveling to the U.S. with the intention of retrieving some items they had in storage in Missouri. VON NUKEM stated that while traveling to the U.S. from the Yucatan, he had stopped in Puerto Penasco, Sonora, where he met a subject he only identified as "Victor" whom had offered to pay him $4,000 in U.S. currency to drive a "load" into the U.S.

17. VON NUKEM agreed to the offer and stated "Victor" took his vehicle for a few days and returned it prior to him leaving Puerto Penasco. VON NUKEM claimed he did not know what type of contraband he would be driving and also denied knowing that the contraband concealed in his car.

18. VON NUKEM stated that he had utilized TARGET DEVICE #1 to communicate with "Victor" while making arrangements and driving the loaded vehicle and additionally VON NUKEM stated he was going to receive text messages from "Victor" further instructing him on who to call once he arrived in Phoenix to deliver the contraband.

19. VON NUKEM also provided agents with "Victor's" phone number that he had utilized while conducting the smuggling operation.

## **TECHNICAL TERMS**

20. Wireless telepghone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

21. Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

22. Portable media player. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some

portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

23. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

24. Based on my training, experience, research, and from consulting the manufacturer's advertisements and product technical specifications available online for these types of cellular phones, and based upon my discussions with experts, I know that the cellular phones which are the subject of this search warrant application most likely have capabilities that allow them to also serve as a radio communication transmitter, wireless telephone, GPS device, wireless internet connectivity, and text message capabilities, as these are generally standard features. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person

who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training and experience, I know that electronic devices such as the TARGET DEVICE in this case, can store information for long periods of time. Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

26. As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICE was used, where it was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be on the TARGET DEVICE is more fully set forth in the factual section contained herein and because:

A. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

B. Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      D.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      E.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of the TARGET DEVICE did not have a relationship with the party.

      27.   The examination of the TARGET DEVICE may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Because this warrant only seeks permission to examine a device already in the possession of HSI, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, there is probable cause for the Court to authorize execution of the warrant at any time in the day or night. Due to the nature of such cell phones, data contained within will remain uncorrupted when being stored for an extended period of time.

/ / /

/ / /

## CONCLUSION

28.     Based on the above information, I respectfully request the issuance of search warrants for TARGET DEVICE #1. Your Affiant requests to search for evidence of violations of Title 21, United States Code, Section 841 as described in Attachment B.

I swear, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

JORGE A DURAN
Digitally signed by JORGE A DURAN
Date: 2021.05.20 13:34:24 -07'00'

Special Agent Jorge Duran
Homeland Security Investigations

Subscribed and sworn telephonically this 20th day of May 2021.

Honorable Bruce G. Macdonald
United States Magistrate Judge

15

## **ATTACHMENT A**

### ITEMS TO BE SEARCHED

TARGET PHONE #1 is a cellular telephone that utilizes phone number 386-341-3800. TARGET PHONE #1 is assigned International Mobile Equipment Identity # 355539116200740. TARGET PHONE #1 is currently in the custody of Homeland Security Investigations, Sells, AZ.

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

1. Data and/or digital files stored on or accessed through the TARGET DEVICE (as described in Attachment A) relating to violations of 21 U.S.C. § 841, wherever it may be stored or found, specifically including:

    a. lists of contacts and related identifying information;

    b. agreements made, directions and instructions received and sent, as well as dates, places, and amounts of specific transactions;

    c. types, amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered as well as dates, places, exchange rates, and amounts of specific transactions;

    d. any information related to sources of money or smuggling activity data (including names, addresses, phone numbers, or any other identifying information);

    e. all bank records, checks, credit card bills, account information, and other financial records.

2. Electronic correspondence stored on or accessed through the TARGET DEVICE relating to alien smuggling, to include emails and attached files, text messages, and instant messaging logs.

3. Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the TARGET DEVICE.

4. Contact lists stored on or accessed through the TARGET DEVICE, to include telephone and email contact names, telephone numbers, addresses, and email addresses.

5. Evidence of persons who used, owned, or controlled the TARGET DEVICE.

6. Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through the TARGET DEVICE.